## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **SUNDAY EGAHI, individually and on behalf of similarly-situated persons,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **CIVIL NO. JKB-24-03728** |
| **WORLDREMIT CORP.,** | * | |
| **Defendant.** | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### MEMORANDUM

Pending before the Court is Defendant's Motion to Strike Class Allegations and Demand for Jury Trial, to Compel Arbitration, and to Stay Action. (ECF No. 15.) For the reasons that follow, the Motion will be granted.

### I.    FACTUAL BACKGROUND

#### A. The Allegedly False Advertisements

On May 18, 2020, Plaintiff Sunday Egahi opened an account with Chime, Inc. d/b/a Sendwave. (ECF No. 15-3 at 2.) Defendant WorldRemit, Corp. acquired Sendwave in February 2021. (ECF No. 15-1 at 3.) Defendant provides various consumer financial services, including international money transfer services. (*Id.*) Plaintiff, an American of Nigerian ancestry, used Defendant's services to send remittance transfers to friends and family in Nigeria. (ECF No. 1 ¶ 8.) He began using Defendant's services on May 18, 2020, and continued using them at least through January 31, 2025. (ECF No. 15-3.)

Plaintiff's primary contention is that Defendant advertised its money transfer services as being almost instant and containing no added fees when, in fact, the money transfers were not

instant and did charge fees. (ECF No. 1 ¶¶ 14–15.) Plaintiff alleges that this marketing was "persistent and constant" and was specifically directed at the Nigerian diaspora in the United States. (*Id.* ¶ 9–10.) Plaintiff asserts that, because of Defendant's allegedly false advertising, he and numerous unidentified individuals made transactions that were not instant and contained added fees. (*Id.* ¶ 25.)

### B. The User Agreements

Between May 18, 2020, and January 31, 2025, six different user agreements governed the relationship between Plaintiff and Defendant. Each user agreement described the terms and conditions by which each party would be bound when a customer used Defendant's services. Several of these terms are relevant here.

To begin, each user agreement contained a modification clause. This clause allowed Defendant to change the terms of the agreement (users, meanwhile, were never allowed to change the agreement). In some user agreements, the modification clause required Defendant to provide advance notice to the user before it changed terms, but in other user agreements, no advance notice was required before Defendant could change the terms of use. Most of the user agreements also contained a merger clause, which stated that the updated agreement superseded all previous user agreements.

Additionally, each user agreement contained various provisions dealing with dispute resolution. In some of the agreements, the parties agreed to waive their rights to a jury trial and to bring a class action. Several of the agreements also contained choice-of-law clauses, which dictated the substantive law that should apply if a dispute arose. Most importantly, several of the user agreements contained arbitration provisions. These provisions required disputes between Defendant and its customers to be settled by binding arbitration. Critically, and as detailed further

below, an arbitration provision is its own contract—which must be supported by independent mutual assent and consideration—that is severable from the remainder of the user agreement. Accordingly, the Court will hereinafter refer to the arbitration provisions as "arbitration agreements."

The following chart lists the six user agreements that Plaintiff and Defendant entered into. It provides the effective date of each user agreement and identifies which key terms are present in each user agreement.

| Date | Relevant Terms | | | | | |
|---|---|---|---|---|---|---|
| | Arbitration | Jury Trial Waiver | Class Action Waiver | Choice-of-law | Modification | Merger |
| Pre-9/10/2020 | Yes | No | No | New York | Advance notice not required | No |
| 9/10/2020 | Yes | Yes | Yes | New York | Advance notice required | Yes |
| 9/15/2021 | Yes | Yes | Yes | New York | Advance notice required | Yes |
| 1/1/2024 | No | No | No | Delaware | Advance notice not required | No |
| 10/11/2024 | Yes | Yes | Yes | Delaware | Advance notice not required | Yes |
| 12/19/2024 | Yes | Yes | Yes | Delaware | Advance notice not required | Yes |

### C. Procedural History

Plaintiff filed his Complaint on December 23, 2024. He brought several claims under the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693, *et seq.*, as well as several related state-law claims. Defendant waived service on January 27, 2025, and then timely answered Plaintiff's Complaint on March 10, 2025. Over the next two months, the parties had one scheduling call with the Court and engaged in limited written discovery. (ECF No. 20-2.) On May 6, 2025, defense counsel informed Plaintiff's counsel that it intended to file a motion to compel arbitration. (ECF No. 21-2.)

Defense counsel filed the motion to compel on July 14, 2025. In the associated briefing, neither party addressed how the modification clauses may affect each party's promise to arbitrate disputes. Therefore, on September 9, 2025, the Court ordered Defendant to show cause why its

3

motion should not be denied in light of a line of cases holding that unilateral modification clauses in user agreements deprive arbitration agreements of consideration. Both parties submitted additional briefing on this issue, and Defendant's Motion to Compel Arbitration is now ripe for resolution.

## II.    STANDARD OF REVIEW

"[M]otions to compel arbitration exist in the netherworld between a motion to dismiss and a motion for summary judgment." *PC Constr. Co. v. City of Salisbury*, 871 F. Supp. 2d 475, 477 (D. Md. 2012) (alteration in original) (quotation omitted). If the Court need not refer to evidence beyond the pleadings and documents integral to the pleadings, then the Court should analyze such a motion under the standard for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *See id.* at 477–78. But, when the Court considers evidence outside those categories, the Court must analyze the motion under the Rule 56 standard for summary judgment. *Id.* Here, the Court will consider as evidence the user agreements, communications between the parties, and relevant affidavits. Accordingly, the Court will evaluate the instant Motion under the Rule 56 standard.

Under Rule 56, a party seeking summary judgment must show that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if there is sufficient evidence for a jury to return a verdict in favor of the nonmovant, but the "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). The Court views the evidence in the light most favorable to the nonmovant and draws all reasonable inferences in that party's favor. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam).

4

At the same time, the Court remains cognizant of the "liberal federal policy favoring arbitration" and the fundamental principle that "courts must place arbitration agreements on an equal footing with other contracts and enforce them according to their terms." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal quotation marks and citations omitted).

## III.    DISCUSSION

This case requires the Court to decide a litany of issues. For the sake of clarity, the Court previews its analysis and conclusions.

First, the Court must determine which user agreement and arbitration agreement govern the parties' relationship. Defendant contends that the December 2024 user agreement controls, despite the presence of the modification clause. The Court disagrees and concludes that the modification clause contained in the December 2024 user agreement robs both it and the arbitration agreement it contains of consideration.

For the same reasons, the Court concludes that the two next most recent user agreements— from January and October 2024—are also unformed because they contain modification clauses which are substantively identical to the December 2024 clause.

By contrast, the Court finds that the September 2021 user agreement—the next most recent—*was* properly formed. Critically, the modification clause in this agreement requires Defendant to provide advance notice to users of any change in terms. Plaintiff's additional challenges to the September 2021 agreement are unavailing. The September 2021 arbitration agreement is valid, Defendant did not waive its right to compel arbitration by litigating this case, and the September 2021 jury trial and class action waivers are valid and enforceable.

Thus, the Court will grant Defendant's Motion in its entirety pursuant to the terms of the September 2021 user and arbitration agreements.

### A. The December 2024 Agreements

The Court first explains why Defendant's principal argument—that the December 2024 user agreement, and the arbitration provision contained within it, governs the entire dispute—is incorrect. For these agreements to control, they must be properly formed. To be properly formed, there must be mutual assent and consideration. *Johnson v. Cont'l Fin. Co., LLC*, 131 F.4th 169, 176 (4th Cir. 2025). Further, under Maryland law, an arbitration agreement is a separate and independent contract even when it is merely a clause in a broader agreement. *Cheek v. United Healthcare of Mid-Atl., Inc.*, 835 A.2d 656, 666–69 (Md. 2003). Thus, it requires its own, independent mutual assent and consideration. *Id.*

In its prior Memorandum and Order, the Court noted the existence of the December 2024 user agreement's modification clause. (ECF No. 22 at 4.) The Court asked the parties to address a line of cases which holds that when a clause allows one party to unilaterally change the terms of a contract, the arbitration agreement located in the broader user agreement is unformed due to a lack of consideration.[1] (*Id.*) The parties have now briefed the issue and the Court holds that, under Maryland law, both the December 2024 arbitration agreement and user agreement lack consideration and are therefore unformed.[2]

---

[1] Although an arbitration agreement is an independent contract, when it is located in a broader user agreement, certain other clauses in the user agreement can be incorporated into the arbitration contract. The caselaw is clear that modification clauses, such as the one at issue here, are incorporated into the arbitration agreement. *See, e.g., Johnson*, 131 F.4th at 179–80; *Ford v. Genesis Fin. Sols., Inc.*, 726 F. Supp. 3d 441, 454 (D. Md. 2024). Defendant does not dispute this point. (ECF No. 23 at 8–9.)

[2] Initially, the parties did not address which state's substantive law applied to the issue of contract formation. In its prior Memorandum and Order, the Court concluded that, based on the facts then before it, Maryland substantive law was applicable. (ECF No. 22 at 4–5.) The parties have now provided additional facts which bolster the Court's conclusion that Maryland's substantive law applies. (*See, e.g.,* ECF Nos. 23-3; 25.) The parties also now agree that Maryland law is applicable. Accordingly, the Court will apply Maryland substantive law to the issue of whether the December 2024 arbitration and user agreements were properly formed.

### 1. Formation of the Arbitration Agreement

The Court begins with the arbitration agreement. Under Maryland law, "consideration may be established by showing a benefit to the promisor or a detriment to the promisee." *Cheek*, 835 A.2d at 661 (internal quotation marks omitted). In the context of arbitration agreements, each party's consideration is their promise of "the forebearance [sic] to exercise a right or pursue a claim," namely, the right to bring suit in a court of law. *Id.* (internal quotation marks omitted). But "[a] promise becomes consideration for another promise only when it constitutes a *binding obligation*." *Id.* (emphasis added). If a promise does not actually bind the promisor to fulfill any obligation, then it is illusory and cannot serve as consideration. *Id.* at 662. And "if there is no other consideration for a return promise, the result is that no contract is created." *Id.* (quoting 2 Arthur L. Corbin, Corbin on Contracts § 5.28 (2003)).

In *Cheek*, the Court of Appeals of Maryland (now the Supreme Court of Maryland) examined whether a promise to arbitrate was binding even though the agreement also contained a unilateral modification clause. This clause allowed the defendant, United HealthCare, "to alter, amend, modify, or revoke the Arbitration Policy at its sole and absolute discretion at any time with or without notice." *Id.* (citation modified). The plaintiff had no such modification right. The Court of Appeals held that, when coupled with the modification clause, United's purported promise to arbitrate was, in fact, "no real promise, and therefore insufficient consideration to support an enforceable agreement to arbitrate." *Id.*

However, three years later, the Court of Appeals held that a different modification clause did not rob an arbitration agreement of consideration. *Holloman v. Cir. City Stores, Inc.*, 894 A.2d 547 (Md. 2006). That was because the modification clause allowed the defendant, Circuit City, to modify or terminate the agreement only "on December 31 of any year upon giving 30 calendar

7

days written notice." *Id.* at 550. Thus, Circuit City did "not have unfettered discretion to alter or rescind the arbitration agreement without notice or consent." *Id.* at 554. These limitations were "adequate to create a binding obligation on Circuit City to submit to arbitration, such that Circuit City's promise to arbitrate under the arbitration agreement constitute[d] consideration, and the agreement [was] enforceable." *Id.*

The Fourth Circuit recently had occasion to analyze *Cheek* and *Holloman* in *Johnson.* In that case, the modification clause allowed the defendant, Continental, "to change any term of this Agreement . . . in [its] sole discretion, upon such notice to [the plaintiff] as is required by law." *Johnson*, 131 F.4th at 174. The terms also allowed the plaintiff to terminate the agreement at any time. *Id.* at 180. The Fourth Circuit first explained that the "required by law" language in the modification clause could not serve as consideration because a "bargained-for exchange by definition assumes that each party will undertake some obligation beyond already imposed by law." *Id.* Recognizing this issue, Continental had argued that "required by law" actually meant "required to make the contract enforceable by law." *Id.* The Fourth Circuit rejected this reading and found the promise to arbitrate to be illusory. However, in doing so, it agreed with Continental that "to make a change clause enforceable" under Maryland law, "an advance notice requirement is necessary." *Id.* (citing *Cheek* and *Holloman*); *see also Trimble v. Entrata, Inc.*, 791 F. Supp. 3d 615, 629 (D. Md. 2025) (finding that an arbitration agreement lacked consideration because its modification clause did not require advance notice to the other contracting party).

In the instant case, the modification clause allows Defendant to "modify this User Agreement from time to time" and states that users "shall not modify this User Agreement." (ECF No. 15-9 at 14.) It also states that users "can review the most current version of the User Agreement at any time by reviewing this website." (*Id.*) The agreement's termination clause then

8

states that users "can terminate this User Agreement at any time and for any reason by contacting [Defendant]." (*Id.* at 13.)  Finally, it allows Defendant to "terminate this User Agreement at any time and for any reason." (*Id.*)  In the Court's view, the facts here are "indistinguishable" from those in *Cheek* and *Johnson*. *See Johnson*, 131 F.4th at 179.  As in those cases, there is no limit on Defendant's discretion to modify, or revoke, the arbitration agreement's terms at its pleasure. Defendant is only required to place the most current version of the User Agreement on its website *after the terms have already been changed.*  As the *Johnson* court explained, "[t]his type of after-the-fact, ineffectual notice is not only likely to elude a cardholder.  It also places no constraint on [Defendant's] ability to escape its contractual obligations whenever it sees fit." *Id.* at 180.

Defendant's attempts to distinguish this binding precedent are unconvincing.  First, Defendant explains that each time it modified a user agreement, it gave actual, advance notice to customers of the change by alerting them via email. (*See* ECF No. 23-3.)  But that is irrelevant. The import of *Cheek* and *Holloman* is that parties must be under a *binding* obligation to arbitrate their disputes.  Just because Defendant chose to notify Plaintiff of a modification does not mean it was bound to do so.  The *Cheek* court recognized as much. *Cheek*, 835 A.2d at 662 n.5 ("Defendant's after-the-fact decision not to exercise [its right to unilaterally cancel the arbitration agreement] does not alter the illusory nature of its original promise to arbitrate." (internal quotation marks and citation omitted, alteration in original)); *accord Trimble*, 791 F. Supp. 3d at 630 & n.16.

Second, Defendant argues that another Maryland Court of Appeals case, *DIRECTV, Inc. v. Mattingly*, 829 A.2d 626 (Md. 2003), controls, not *Cheek*.  But as Defendant itself recognizes, "*DIRECTV* did not consider the issue of whether the modification clause rendered consideration for an arbitration clause illusory." (ECF No. 23 at 11 n.4.)  Rather, *DIRECTV* only discussed whether there was mutual assent to a modification.  Thus, *DIRECTV* offers no reasoning that is

9

relevant to the instant matter. *See Trimble*, 791 F. Supp. 3d at 629 (highlighting the differences between the mutual assent and consideration analyses). Even if *DIRECTV* had analyzed consideration, its facts are easily distinguishable. In that case, the modification clause required DIRECTV to send customers "a written notice describing the change and its effective date." *DIRECTV*, 829 A.2d at 628. Conversely, here, Defendant is not required to send advance, written notice of any changes to its customers. Thus, *DIRECTV* is inapposite.

Third, Defendant contends that the "advance notice requirement" identified in *Johnson* is not, in fact, a requirement. Defendant asserts that when *Johnson* used this language, it was not trying to create a specific test but only distinguish the modification clause in *DIRECTV* from the one in *Johnson*. Defendant misreads both the text and the context. *Johnson* says:

> And since **Cheek and Holloman held that an advance notice requirement is necessary to make a change clause enforceable,** Continental argues that the clause here should be interpreted to include such a requirement. *See* Opening Brief at 34.

*Johnson*, 131 F.4th at 180 (emphasis added). While the second part of the sentence refers to Continental's argument, the first half is the Fourth Circuit's own assessment of *Cheek* and *Holloman*. Thus, the text is clear that advance notice is a requirement. As for the context, *DIRECTV* was irrelevant to the Fourth Circuit's analysis. The court plainly based its analysis on *Cheek* and *Holloman*. It did not discuss *DIRECTV* until later in the opinion.

Finally, Defendant asserts that even if advance notice is required, the modification clause here already mandates it because Defendant must post the updated user agreement on its website. And Defendant points out that users can terminate the agreement once they learn of the modification. But that is not necessarily true. If Defendant wanted to, it could change the terms of acceptance and cancellation and make Plaintiff bound to the agreement as soon he accesses Defendant's website, or Defendant could forbid Plaintiff from terminating the agreement. *Johnson*

stands for the proposition that one party to an arbitration agreement cannot have the power to change terms without first giving the other party notice and an opportunity to object or terminate the contract. 131 F.4th at 180. Indeed, there was only consideration in *Holloman* because the *original* contract required 30-day advance notice of the change, so the defendant could not pull the proverbial rug out from under the plaintiff as the modification clause here allows. Thus, the arbitration agreement lacks consideration and is not an enforceable contract.

### 2. Formation of the User Agreement

Although the arbitration agreement is unformed due to a lack of consideration, it does not necessarily follow that the broader user agreement is also unformed. Because the arbitration and user agreements must be supported by separate consideration, there is potentially an argument to be made that the modification clause does not render the user agreement illusory. In his *Johnson* concurrence, Judge Wynn specifically noted this possibility. *Id.* at 182 n.* (Wynn, J., concurring). However, Judge Wynn also conceded that "the majority opinion suggests otherwise." *Id.* And to be sure, the majority opinion explains that "Maryland courts have found this kind of [modification] clause to be so one-sided and vague that it allows a party to escape *all of its contractual obligations at will.*" *Id.* at 179 (majority opinion) (emphasis added). Furthermore, Plaintiff does not argue that the user agreement is properly formed. Thus, the Court finds that the December 2024 user agreement is unformed, along with the arbitration agreement. *Accord Trimble*, 791 F. Supp. 3d at 630 ("Therefore, these clauses rendered illusory any mutual promise acting as consideration for *the Terms and the Arbitration Provision.*" (emphasis added)).

### B. The January and October 2024 Agreements

Because the December 2024 user and arbitration agreements are unformed, the next question is if any of the prior agreements are properly formed. The modification clause in the

October 2024 user agreement (ECF No. 20-8 at 14) is substantively identical to the December 2024 clause. Accordingly, the October 2024 user and arbitration agreements are unformed.

The January 2024 user agreement does not contain an arbitration agreement. However, it does contain a modification clause, which allows only Defendant to change the terms. Furthermore, the agreement states that advance notice of the changes will only be given if "required under your country's law." This language is analogous to the "required by law" language that the *Johnson* court held could not furnish consideration. *See Johnson*, 131 F.4th at 174. Thus, the January 2024 user agreement lacks consideration and is unformed.

### C. The September 2021 Agreements

The Court next considers the September 2021 user agreement. This agreement contained both an arbitration agreement and a modification clause that required advance notice. Thus, the Court finds that both the user and arbitration agreements are properly formed. The Court also finds that these agreements cover all disputes in this case. Finally, the agreements are otherwise valid and enforceable.

### 1. Formation

The first issue for both the user and arbitration agreements is whether there was mutual assent. The user agreement states that a user accepts the agreement by "downloading, accessing, and using" Defendant's application. (ECF No. 15-6 at 2.) This type of agreement, known as a "browsewrap" agreement, "does not require a user to click a box or button indicating that he or she agrees to certain terms to use the website, but instead attempts to bind the user to hyperlinked terms simply through using the website." *Trimble*, 791 F. Supp. 3d at 628 (internal quotation marks and citation omitted). Generally, actual or constructive knowledge of the contract's terms is required for a browsewrap agreement to be accepted. *Watkins v. Carr*, No. CV PX-17-0819,

2018 WL 10741730, at *3 (D. Md. Jan. 12, 2018). Here, Defendant's Chief Financial Officer attests that, each time the user agreement was updated, customers were informed via email. (ECF No. 15-1 ¶ 17.) Defendant has also produced such emails for several of the user agreement updates. (ECF Nos. 23-1, 23-2.) Although Plaintiff states that he "did not see" the September 2021 user agreement (ECF No. 20-1), Defendant has sufficiently proven that Plaintiff received the user agreement—and its included arbitration agreement—via email. Thus, even if Plaintiff was not actually aware of the agreements, he had constructive knowledge of their terms. Accordingly, there was mutual assent to the September 2021 user agreement and arbitration agreement.

There was also consideration for both agreements because the modification clause required advance notice. The modification clause stated that Defendant could modify the terms at any time and that users "will be deemed to have agreed to any such changes if [they] continue to use the Application after [they] have been notified of any such changes." (ECF No. 15-6 at 10.) While the issue is close, the Court finds that this modification clause limits Defendant's discretion enough to constitute consideration for its promise to arbitrate. To be sure, this clause does not specify the precise manner of notice nor the time period that Defendant must wait before making a change, as was the case in *Holloman.* But, unlike the December 2024 modification clause, this clause plainly requires that users be notified of any changes *before* they occur. Then, the user can simply stop using Defendant's services if they disagree with the change. This satisfies the standards laid out in *Johnson, Cheek,* and *Holloman* because the right to arbitrate does not exist merely at the pleasure of one party. *Johnson,* 131 F.4th at 180. Thus, the modification clause does not render Defendant's promise to arbitrate illusory, nor does it render the broader user agreement illusory. As a result, both the September 2021 arbitration and user agreements are properly formed.

13

### 2. Scope

The September 2021 agreements also apply to all the transactions that Plaintiff complains of. The Fourth Circuit has held that when a later user agreement states that it "encompasses and embodies all terms, understandings, and agreements" between the parties, this agreement supplants all prior agreements. *Levin v. Alms & Assocs., Inc.*, 634 F.3d 260, 267 (4th Cir. 2011). And when the later user agreement's arbitration agreement states that it applies to "any dispute" between the parties, it applies retroactively to disputes which arose while earlier agreements had been in effect. *Id.* That is because the merger clause and arbitration agreement "can easily be read together . . . to encompass *all* agreements and *any* disputes, past and present, especially given that the presumption in favor of arbitrability is particularly applicable when the arbitration clause is broadly worded." *Id.*

Here, the September 2021 user agreement contains a merger clause stating that the user agreement "supersed[es] all prior agreements" between the parties and "constitutes the entire understanding" between them. (ECF No. 15-6 at 10.) And the arbitration agreement applies to "any dispute or claim." (*Id.* at 9.) Finally, Plaintiff continued using Defendant's services at least until January 31, 2025, which was well after the effective date of the September 2021 user agreement. (ECF No. 15-3 at 8.) Thus, the September 2021 user agreement and arbitration agreement apply to the entirety of Plaintiff's claims.[3]

---

[3] In *Levin*, the Fourth Circuit seemed to apply the federal common law of arbitration to conclude that a later user agreement containing an arbitration agreement superseded a previous user agreement which did not contain an arbitration agreement. However, in other cases, the Fourth Circuit has applied state contract law to this question. *See, e.g., Meadows v. Cebridge Acquisition, LLC,* 132 F.4th 716, 727 (4th Cir. 2025). The Court need not resolve this seeming inconsistency here because New York law (which is applicable because of the choice-of-law clause in the September 2021 agreement, *see infra*) dictates the same result as the federal common law applied in *Levin. See, e.g., Yeled V'Yalda Early Childhood Ctr., Inc. v. Attentive Behav. Mental Health Counseling, P.C.,* 175 N.Y.S.3d 250, 253 (N.Y. App. Div. 2022) ("Where the parties have clearly expressed or manifested their intention that a subsequent agreement supersede or substitute for an old agreement, the subsequent agreement extinguishes the old one." (internal quotation marks and citation omitted)).

### 3. Validity

Plaintiff contends that even if the September 2021 arbitration agreement is properly formed, it is still invalid due to impossibility, frustration of purpose, and unconscionability. The Court disagrees.

But first, the Court must address two preliminary issues. Unlike the December 2024 agreement, the September 2021 arbitration agreement contains a delegation clause. (ECF No. 15-6 at 9.) This clause requires even threshold disputes over arbitrability to be resolved by an arbitrator. Had Plaintiff challenged the validity of the September 2021 *user* agreement, then this delegation clause would have required an arbitrator to decide the issue. *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010). However, because Plaintiff has specifically challenged the validity of the *arbitration* agreement itself, "the federal court must consider the challenge before ordering compliance with [the arbitration] agreement." *Id.* at 71.

Next, the Court must reconsider which state's substantive law applies to Plaintiff's contract validity challenges. Where, as here, a case arises under federal law but incorporates a state law issue, a federal court applies the conflict of law rules of the state in which it sits. *In re Merritt Dredging Co., Inc.*, 839 F.2d 203, 206 (4th Cir. 1988); *Johnson v. Carmax, Inc.*, No. 10–CV–213, 2010 WL 2802478, at *2 (E.D. Va. July 14, 2010). Under Maryland conflicts principles, courts must ordinarily enforce contractual choice-of-law clauses. Although it is "nonsensical to enforce a choice-of-law clause" when contract *formation* is at issue because the Court has not yet confirmed that an agreement exists, that is not the case when contract *validity* is challenged. *Johnson*, 131 F.4th at 178. That is because "a claim that a contract is *invalid* presupposes the existence of a contract but maintains that it should not be enforced." *Id.* at 176 (emphasis in

15

original).  Under Maryland law, contracting parties can "specify in their contract that the laws of a particular State will apply in any dispute over the validity, construction, or enforceability of the contract." *Jackson v. Pasadena Receivables, Inc.*, 921 A.2d 799, 803 (Md. 2007).  Here, the September 2021 user agreement states that it is governed by New York law.  (ECF No. 15-6 at 10.)  Because "the choice-of-law clause is a generally applicable provision in the wider contract," the Court finds that it is incorporated into the arbitration agreement. See *Ford*, 726 F. Supp. 3d at 455.  Thus, the Court will apply New York's substantive law to determine if the arbitration agreement is valid.

Under New York law, "impossibility excuses a party's performance only when the destruction of the subject matter of the contract or the means of performance makes performance objectively impossible." *Ithaca Montessori Sch. v. Pfeffer*, 237 N.Y.S.3d 776, 778 (N.Y. App. Div. 2025).  However, impossibility can only "be produced by an unanticipated event that could not have been foreseen or guarded against in the contract." *Id.* at 778–79.  Here, Plaintiff claims that performance is impossible because the selected arbitrator, the National Arbitration Forum (NAF), does not hear consumer arbitration disputes.  Plaintiff attaches an agreement between the Minnesota Attorney General and the NAF, which purports to prohibit the NAF from hearing consumer arbitration cases because of NAF's deceptive practices.  (ECF No. 20-4.)  While Plaintiff asserts that this agreement was entered as a consent judgment by a court, the document he attaches does not bear a judge's signature.  (*Id.* at 6.)  Regardless, even if the consent judgment is valid, it was executed in 2009.  The arbitration agreement was executed in September 2021.  The Minnesota Attorney General's action was not unanticipated or unforeseeable because it occurred twelve years before the arbitration agreement was executed.  The documents Plaintiff attaches also

say nothing about NAF's status in 2026. Accordingly, the agreement is not invalid due to impossibility.

A similar rationale applies to Plaintiff's frustration of purpose argument. This defense "is not available where the event which prevented performance was foreseeable and provision could have been made for its occurrence." *Warner v. Kaplan*, 892 N.Y.S.2d 311, 315 (N.Y. App. Div. 2009). As the issues relating to NAF were foreseeable, frustration of purpose does not render the arbitration agreement invalid.

Finally, Plaintiff argues that the arbitration agreement is unconscionable. "A determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made." *Kaufman v. Relx Inc.*, 180 N.Y.S.3d 148, 150 (N.Y. App. Div. 2022). Procedural unconscionability "examines the circumstances at the time an agreement was entered into." *Id.* Here, while Defendant drafted the user agreement and the arbitration agreement was located on page eight of the user agreement, Plaintiff was not pressured to agree to the contract. Rather, he used Defendant's services of his own volition and had already been doing so for over a year when the September 2021 agreement came into effect. Thus, there was no procedural unconscionability.

The arbitration agreement was also not substantively unconscionable. There is substantive unconscionability when the terms of the contract itself are "unreasonably favorable to the other party." *Emigrant Mortg. Co. v. Fitzpatrick*, 945 N.Y.S.2d 697, 699 (N.Y. App. Div. 2012). That is not the case here. Plaintiff contends that, in a prior investigation, the Consumer Financial Protection Bureau ("CFPB") found several terms of Defendant's user agreements to be illegal. (*See generally* ECF No. 15-2.) But Plaintiff's unconscionability challenge is only to the arbitration agreement, not the user agreement, and the CFPB took no issue with the arbitration agreement.

17

Despite Plaintiff's protestations, it is also not unreasonable to require him to pay his own costs at arbitration. Accordingly, the arbitration agreement is not substantively unconscionable.

### 4. Waiver via Litigation

Plaintiff next argues that Defendant waived its right to compel arbitration by litigating the matter in this Court first. It is unclear if the Court should evaluate waiver as a matter of federal procedural law or as a substantive state law contract defense. *Compare Morgan v. Sundance, Inc.*, 596 U.S. 411, 416–17 (2022) (assuming without deciding that waiver should be evaluated under federal procedural law), *with Blitz v. USAA Gen. Indem. Co.*, No. CV RDB-24-1070, 2024 WL 4815980, at *2 n.8 (D. Md. Nov. 18, 2024) (emphasizing that it remains unclear whether waiver of arbitration should be considered under federal procedural law or state substantive law), *and P.S. Fin., LLC v. Eureka Woodworks, Inc.*, 184 N.Y.S.3d 114, 125 n.5 (N.Y. App. Div. 2023) (analyzing waiver of arbitration under New York law). The parties again fail to brief this underlying choice-of-law issue. Given the Supreme Court's dictum in *Morgan*, the Court concludes that waiver of arbitration is best considered a federal procedural rule. However, the distinction is irrelevant here because Defendant did not waive its right to compel arbitration under federal law or New York law.

The Fourth Circuit has explained that "waiver in the arbitration context, like waiver generally, is simply 'the intentional relinquishment or abandonment of a known right.'" *SZY Holdings, LLC v. Garcia*, No. 23-1305, 2024 WL 3983944, at *3 (4th Cir. Aug. 29, 2024) (unpublished) (quoting *Morgan*, 596 U.S. at 419). But "simply failing to assert arbitration as an affirmative defense does not constitute default of a right to arbitration." *Forrester v. Penn Lyon Homes, Inc.*, 553 F.3d 340, 343 (4th Cir. 2009). Nor will "delay and participation in litigation . . . . alone constitute default." *Id.* Indeed, in *SZY Holdings*, the Fourth Circuit held that there was no

18

waiver even though the moving party waited more than nine months to file its motion to compel arbitration.  2024 WL 3983944, at *3.  That was because the party "consistently requested arbitration before formally moving to compel it." *Id.*

Here, the Complaint was filed on December 23, 2024.  Defendant answered on March 10, 2025, and did not raise arbitration as an affirmative defense.  Over the next two months, the parties had a single scheduling call with the Court (ECF No. 20-2 at 1) and Plaintiff propounded limited written discovery on Defendant (ECF No. 21-1).  Defendant then sent its initial disclosures to Plaintiff on May 6, 2025.  (ECF No. 20-3.)  On that same day, Defendant's counsel informed Plaintiff's counsel that they intended to file a motion to compel arbitration.  (ECF No. 21-2.)  Plaintiff's counsel ignored defense counsel's request to discuss arbitration.  (ECF No. 21-4.)  Over the next two months, the parties continued to engage in limited written discovery, but no depositions were taken and no motions were filed.  The motion to compel arbitration was then filed on July 14, 2025.  Overall, Defendant made its intention to compel arbitration clear just two months after filing its Answer.  No significant litigation occurred, and Plaintiff's counsel contributed to a portion of the delay.  Accordingly, as a matter of federal procedural law, Defendant did not waive its right to compel arbitration.

Even if the Court were to apply New York law, there would still be no waiver.  New York courts "consider the amount of litigation that has occurred, the length of time between the start of the litigation and the arbitration request, and whether prejudice has been established." *NBC Universal Media, LLC v. Strauser*, 140 N.Y.S.3d 26, 27 (N.Y. App. Div. 2021).  As noted above, there has only been limited discovery and, as in *Strauser*, there has been "no motion practice and no depositions" have been taken. *Id.*  Furthermore, in *Strauser*, the waiver argument was rejected even though litigation had been ongoing for 26 months before arbitration was demanded.  (*Id.*)

Meanwhile, here, Defendant first stated that it would seek to compel arbitration less than five months after the Complaint was filed. Accordingly, Defendant did not waive its right to compel arbitration.

### 5. Class Action and Jury Trial Waivers

That brings the Court to Plaintiff's final argument—that even if the arbitration agreement is enforceable, the class action and jury trial waivers are not. Both terms are contained in the September 2021 arbitration agreement itself, and the Court has already concluded that the agreement is properly formed and its terms are valid.

Further, even if these two terms are severable, they are still valid and must be enforced. As for the jury trial waiver, Plaintiff's main argument is that Defendant waived its right to assert it. But motions to enforce jury trial waivers can be filed at any time, as permitted by Rule 39, Federal Rules of Civil Procedure. *See Schmidt v. Wells Fargo Bank, N.A.*, No. 8:20-CV-150-T-33AAS, 2020 WL 1911466, at *2 (M.D. Fla. Apr. 20, 2020) (collecting cases). Thus, this claim lacks merit.

As for the class action waiver, Defendant objected to certification of a class in its Answer (ECF No. 3 at 4), so it did not waive its right to enforce the class action waiver. Plaintiff additionally argues that class action waivers are illegal under the EFTA. The relevant statutory provision states:

> No writing or other agreement between a consumer and any other person may contain any provision which constitutes a waiver of any right conferred or cause of action created by this subchapter. Nothing in this section prohibits, however, any writing or other agreement which grants to a consumer a more extensive right or remedy or greater protection than contained in this subchapter or a waiver given in settlement of a dispute or action.

15 U.S.C. § 1693*l*. 15 U.S.C. § 1693m(a) then permits individual and class actions against "any person who fails to comply with any provision of this subchapter with respect to any consumer." The issue for Plaintiff is that § 1693m(a) does not confer a right or cause of action within the meaning of § 1693*l*. The Supreme Court has repeatedly addressed similar statutes and has held that they do not confer a right to sue in court. *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 100–02 (2012) (collecting cases). And "if a cause-of-action provision mentioning judicial enforcement does not create a right to initial judicial enforcement, the waiver of initial judicial enforcement is not the waiver of a right" conferred by the EFTA. *Id.* at 101. Thus, the user agreement's class action waiver is enforceable.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion to Strike Class Allegations and Demand for Jury Trial, to Compel Arbitration, and to Stay Action (ECF No. 15) will be granted. The terms of the September 2021 user and arbitration agreements will govern the parties' relationship, and the action will be stayed pending arbitration proceedings. *See Smith v. Spizzirri*, 601 U.S. 472, 474 (2024). A separate Order follows.

DATED this __9__ day of January, 2026.

BY THE COURT:

James K. Bredar
United States District Judge

21